JULIUS F. HOLMES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71345.    Promulgated August 24, 1937.

*Neilson Olcott, Esq., Charles B. McInnis, Esq.;* and *Randolph Paul, Esq.,* for the petitioner.
*E. A. Tonjes, Esq.,* for the respondent.

#### OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the income tax of the petitioner for the year 1930 in the sum of $51,807.55.

The sole issue is the deductibility of a net loss of $1,198,200 sustained in 1929, of which $565,329.57 is sought to be carried forward as a deduction from the petitioner's gross income for the taxable year.

In 1924, the petitioner passed his entrance examinations for Princeton University, but chose to go to work in the plant of the American Diamalt Co., a subsidiary of the Fleischmann Co., which had been founded by his grandfather. In the early part of 1925 he returned to New York to work in the manufacturing department of the Fleischmann Co. He was one of the sons who were to assume the management of that department and eventually he was to become its head. Its manager apparently resented his presence and assigned him no work. He thereupon became dissatisfied and decided to enter some other business.

In the fall of 1925 the petitioner discussed with his father-in-law, who maintained his stock brokerage office with Libaire & Co., the type of business which appealed to the petitioner. After a time he decided to engage in the business of buying and selling corporate stocks and obligations. Thereupon he began to investigate the stocks of certain companies, the type and character of the management of the companies, their earning record, sales, sales outlook and general business conditions surrounding them, and to obtain information and advice from his father-in-law and friends.

The petitioner used his own money from his income account and also money borrowed by hypothecating securities constituting his principal. All purchases were made with the intention of disposing of the stock at a profit. The petitioner bought both listed and unlisted stocks. Practically all transactions were in lots of 100 and on margin.

The petitioner's activities in purchasing and selling stock, largely of representative companies listed on the Exchange, may be summarized as follows:

| Year | Purchase | Sales | Shares | Transactions |
|------|----------|-------|--------|--------------|
| 1925 | $167,577.50 | $16,652.00 | [1] 2,200 | 9 |
| 1926 | 265,927.50 | 176,644.64 | [1] 6,060 | 24 |
| 1927 | 325,097.50 | 162,126.80 | 7,800 | 21 |
| 1928 | 95,065.00 | 112,459.00 | 1,753 | 12 |
|      | [2] 32,000.00 | | [2] 16,000 | |
| 1929 | 4,296,435.34 | 2,201,134.78 | [3] 101,254 | 213 |
| 1930 | 1,751,887.58 | 1,287,932.14 | [3] 48,006 | 179 |

[1] Bought (approximately) $101,000 bonds, sold $52,000 bonds.
[2] Ultimate purchases of Standard Hydrogenation Co. stock.
[3] Includes stock rights.

In addition to purchasing and selling the securities comprehended in the above summary the petitioner also engaged in the following transactions:

1925: Purchased unlisted common stock of the Miami Laundry Co. Later he exchanged it for land at Montauk, Long Island.

1926: With three others the petitioner formed the Club Match Corporation for the purpose of building a match-packing machine. The stock was unlisted. The machine was a failure and the venture was abandoned.

1928: The petitioner became interested in the oil hydrogenation process and advanced $10,000 to the inventor, receiving unlisted stock in the Wade Patent Holding Co. He later furnished $22,000 under like conditions. Subsequently he received 16,000 shares of stock of the Standard Hydrogenation Co., which was formed to take over the activities of the Wade Patent Holding Co. and to offer its own stock to the public.

1929: In February the petitioner purchased 5,000 shares of the common stock of the Merlin Products Co., which owned a soap-manufacturing process. In the fall the petitioner purchased for $41,000, 100 shares of the unlisted preferred stock of the Union Solvents Co., receiving 1,000 shares of common stock as a bonus. He also purchased stock of the Super Steam Co., costing $2,000.

At the suggestion of friends and former classmates, the petitioner, on January 3, 1927, purchased 33,834 shares of stock of the Domestic Electric Refrigerator Corporation (hereinafter called the Domestic Co.), a company just formed to take over some patents. He then understood that a public offering of the stock would be made. In April he became dissatisfied with the progress and operation of the company but still believed implicitly in its possibilities. In May 1927 he was the largest single stockholder and was made president of the company. Thereupon, he devoted considerable time in an effort to correct the manufacturing conditions and, ultimately, to straighten out the organization itself.

The petitioner's purchases of Domestic Co. stock in 1927 were as follows:

| 1927 | Shares | Purchase price | 1927 | Shares | Purchase price |
|---|---|---|---|---|---|
| Jan. 3 | 33,834 | $30,500 | Aug. 16 | 185,400 | $154,500 |
| Mar. 24 | 16,668 | Bonus | Aug. 16 | 53,334 | 50,000 |
| Apr. 11 | 1,500 | 1,500 | | | |
| June 16 | 60,000 | 50,000 | Total | 374,736 | 306,500 |
| Aug. 9 | 24,000 | 20,000 | | | |

At the petitioner's request, in July J. M. Eriksen & Co. made a public offering of 50,000 shares of the Domestic Co.'s stock at $350 per share, but was unsuccessful in disposing of any of the stock. The petitioner then purchased the remainder of the stock held by an associate and obtained complete control of the company. He

considered that the only possible way to protect his stock purchases was to buy out the holdings of that associate and his friends. The petitioner advanced funds to the company, guaranteed its accounts and extended his personal credit for its benefit.

After the stock purchase he secured John F. Plummer to build up the organization of the company and to attempt to salvage the petitioner's stock holdings. Plummer was a man of experience in organization work. He assured the petitioner that the company's affairs could be adjusted so that he would recoup the expenditures made for the company and a proper stock offering could be presented to the public. Plummer suggested that the name of the company be changed to Holmes Products, Inc., hereinafter called the Holmes Co.

During 1928 the petitioner concluded that the Domestic Co. would not be a profitable venture and decided to discontinue it and take over all its assets. He acquired those assets in exchange for his notes against the company. The Domestic Co. was liquidated during 1928 and its assets transferred to the Holmes Co. in exchange for 3,077 shares of the latter company's stock issued to the petitioner. During the same year he also purchased 2,245 additional shares for $224,500. The petitioner and his mother were the only stockholders of the Holmes Co.

In the summer of 1928 the petitioner sought to make a public offering of the Holmes Co. stock and to that end conferred with Campbell & Patterson, a firm engaged in marketing stock to the public. No offering was made because the company was not in a condition to justify it.

After the petitioner's original acquisition of the 3,077 shares of the Holmes Co. stock he advanced further funds to that company as they were required by it and received its stock for such advances. He also guaranteed the company's accounts and its manufacturing and material supply contracts and extended his personal credit for its benefit. This process continued as long as the company existed. The petitioner took out a life insurance policy for $1,625,000 with the Holmes Co. as beneficiary.

In the summer of 1929 the petitioner determined that the Holmes Co. could not be made successful. He, therefore, wound up its affairs and liquidated it. He sustained a loss of $1,198,200 in 1929 by reason of the worthlessness of his Holmes Co. stock. The excess of such loss over his income for 1930 was $565,329.57.

The petitioner contends that $565,329.57 of a net loss of $1,198,200 sustained by him in 1929 should be deducted from his taxable income for the year 1930, under the provisions of section 117 (b) of the

Revenue Act of 1928 [1] and article 651 of Regulations 74. [2]   He asserts that the loss was attributable to the operation of a trade or business regularly carried on by him, viz., the business of buying and selling corporate securities.

The respondent concedes that the petitioner sustained a loss of $1,198,200 in 1929 but denies the deductibility of any portion of that loss in determining 1930 net income, holding that the activities of the petitioner did not constitute a trade or business regularly carried on by him and that even if it had been so carried on by the petitioner the loss itself was not attributable to the business.

The record establishes that petitioner's "trade or business" was buying and selling stocks and securities.   It is a fair conclusion also that his initial purchase of the Domestic Co. stock was in accord with that business.   It does not follow, however, that his every subsequent act in relation to that stock is to be construed as an incident to the carrying on of the business.   The loss in question did not arise from the purchase of the stock of the Domestic Co.   It occurred when the Holmes Co. was wound up.   In the period between the original purchase and the final wind-up, much had happened.

The record reveals that the petitioner became interested in the matter of electric refrigeration and in the management of the Domestic Co.   He discovered that the affairs of the company were not being conducted properly and that the value of his stock was diminishing.   Instead of selling the stock and taking such loss as he would

---

[1] SEC. 117. NET LOSSES.

(a) *Definition of "net loss."*—As used in this section the term "net loss" means the excess of the deductions allowed by this title over the gross income, with the following exceptions and limitations:

(1) NON-BUSINESS DEDUCTIONS.—Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall be allowed only to the extent of the amount of the gross income not derived from such trade or business;

\*          \*          \*          \*          \*          \*          \*

(b) *Net loss as a deduction.*—If, for any taxable year, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount thereof shall be allowed as a deduction in computing the net income of the taxpayer for the succeeding taxable year (hereinafter in this section called "second year"), and if such net loss is in excess of such net income (computed without such deduction), the amount of such excess shall be allowed as a deduction in computing the net income for the next succeeding taxable year (hereinafter in this section called "third year") ; the deduction in all cases to be made under regulations prescribed by the Commissioner with the approval of the Secretary.

[2] ART. 651. *Net losses, definition and computation.*—The term "net loss" as used in section 117 applies to a net loss during the taxable year in a trade or business regularly carried on by the taxpayer.   Included therein are losses from the sale or other disposition of real estate, machinery, and other capital assets used in the conduct of such trade or business.   See section 101 and article 503 with reference to the deduction of capital net losses.   In order to be entitled to claim an allowance for a "net loss" the taxpayer must have suffered an actual net loss in a trade or business during the taxable year.   The amount properly allowed may be neither the loss reflected by the return filed for the purpose of the income tax nor the net loss shown by the taxpayer's profit and loss account, but is to be computed according to the Act.

\*          \*          \*          \*          \*          \*          \*

have been compelled to suffer, he purchased more stock, sank more money in the enterprise in order to gain control of the company, and took over its management. He underwrote the Holmes Co. by taking out an insurance policy on his life for $1,625,000. Such conduct was quite different from his conduct as a trader in securities.

We are of opinion that the statute grants permission to carry forward net losses to those who are engaged in a trade or business as it is ordinarily carried on and understood. The petitioner did not follow his own custom in his treatment of the Domestic Co. stock. His other purchases and sales of stock were made in lots of 100 on margin in the open market. His purchases of Domestic Co. stock were out of proportion to and out of harmony with his transactions in listed stocks and his customary trading on the market. No shares of the Domestic Co. stock were offered for sale, and his attitude toward and interest in the affairs and success of that company were entirely different in character from his conduct toward his market trading transactions. His heavy investment in the stock and his attention to the company affairs were undoubtedly prompted by a business motive, but to say that is not to hold it to be a trade or business regularly carried on.

The petitioner's occasional purchases of unlisted securities were usually as investments in concerns in which his friends were interested. He did not "deal" in such stocks as he did in the securities which he acquired in the usual manner.

Thus, we can not say that the petitioner's transactions in the Domestic Co. and Holmes Co. stock came within the category of purchases and sales of stock and securities, the business in which he claims to have been engaged and which, he asserts, entitles him to the benefit of the provisions of section 117 of the statute. Nor was the loss incurred in any trade or business regularly carried on.

The facts in the case before us bear a striking similarity to those in *Wade L. Street et al., Executors*, 26 B. T. A. 17 (affirmed *per curiam*, United States Circuit Court of Appeals, Second Circuit, 67 Fed. (2d) 1012); certiorari denied, 292 U. S. 637. In that case we said:

The petitioners next contend that the loss was sustained by the decedent in the course of his business of buying and selling securities for profit, which was a business regularly carried on by him over a period of years. We will assume, since we need not decide, that the decedent's activities in buying and selling securities for profit were a business regularly carried on by him during the year 1923. The statute requires, in addition, that the net loss result from the operation of the business. It may include losses sustained from the sale of capital assets used in the conduct of such trade or business. The decedent's ownership of the T. A. Snider Preserve Company stock was quite unlike his ownership of other stocks. He did not acquire or own the Preserve Company

stock for the same purposes which he acquired and owned the other stock. He was not an ordinary stockholder in the Preserve Company as he was in the other companies. He was the principal, if not the sole owner of the company, its president, treasurer, and general manager. He was the principal person in the company and conducted its business affairs for it. The decedent, in his stock market activities, purchased only securities listed on the New York Stock Exchange; seldom sold securities in blocks larger than 100; was prompted in his purchasing and selling by market considerations; and traded actively. He made no effort to sell the Preserve Company stock in small blocks. It was not listed on the New York Stock Exchange. He did not buy and sell it depending upon market fluctuations. He made no effort to sell less than all of his stock in this company, i. e., either complete ownership of the corporation or at least a majority interest. The Preserve Company stock was not an asset used in the conduct of the business of buying and selling stocks and bonds, but was an asset quite apart from that business and held for an entirely different purpose and under different circumstances. It had no relation whatever to that business. Some of the capital assets used in the conduct of that business were shares of stock similar to the Preserve Company stock, but there the similarity ends. Under such circumstances we hold that the loss did not result from the operation of a business of buying and selling securities regularly carried on by the decedent.

See also *Leon C. Coblens*, 27 B. T. A. 215; *A. P. Hunt*, 33 B. T. A. 946. Cf. *Ida A. Van Dyke*, 23 B. T. A. 946 (affirmed per curiam, 63 Fed. (2d) 1020, and 291 U. S. 642).

The deduction claimed is disallowed.

*Decision will be entered for the respondent.*